## Sesmer v. Barton's Administratrix.

(Decided March 3, 1933.)

H. K. BOURNE and TODD & BEARD for appellant.
TURNER & BATES and R. F. PEAK for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming in part and Reversing in part.

On September 7, 1929, Dr. S. P. Sesmer filed an ordinary action against the administratrix of the estate of Leonard Barton on a note for $1,866, dated December 8, 1920. The defendant pleaded non est factum, and that the note was procured by fraud and misrepresentation. Dr. Sesmer also filed a petition in equity against the administratrix in which he alleged that he had given Leonard Barton 695 treatments beginning December 18, 1921, and ending December 28, 1928, for which deceased agreed to pay him at the rate of $6 per treatment.

In an amended petition he relied upon a writing dated January 18, 1921, alleged to have been signed by Leonard Barton, and which was filed as an exhibit. The writing reads:

"New Castle, Ky., January 18, 1921.
"Agreement:
"I agree to pay Dr. S. P. Sesmer $360 per

year for treating me periodically if I will come to his office provided the treatments will not exceed over 60 treatments a year. Otherwise I agree to pay for the treatments above 60 accordingly.

"[Sgd] L. Barton

"Witness: E. F. Napierala."

The defendant in her answer denied that this writing was executed by Leonard Barton, denied that the treatments had been given, and pleaded payment. She later filed a motion to transfer the action brought in equity to the ordinary side of the docket, and to consolidate it with the action brought on the note.

The court overruled this motion apparently on the theory that a large number of accounts were involved. The accounts were not complicated, and the action was purely an ordinary one, and the motion to transfer it to the ordinary side of the docket should have been sustained, but appellee concedes that substantially the same result was obtained when the court submitted certain questions out of chancery to the jury at the same time the action on the note was submitted. On the trial of the ordinary action, the jury returned a verdict for the defendant, and on the issues out of chancery in the equity action the jury found that Leonard Barton had not signed the writing dated January 18, 1921, and that he had paid appellant for all services rendered subsequent to that date. Orders dismissing both petitions were entered, and these orders are treated as a single judgment on this appeal.

A reversal of the judgment is urged on the following grounds: (1) There was no evidence authorizing a submission of the case to the jury, and appellant's motion for a directed verdict in his favor should have been sustained; (2) the verdict is flagrantly against the evidence; and (3) appellant is entitled to a new trial on the grounds of newly discovered evidence.

Dr. S. P. Sesmer, a citizen of Russia, emigrated from that country a number of years ago. He was a graduate of a medical school in Russia and of one in Germany, and, before he left Russia, practiced his profession in that country. Soon after he came to this country he settled in New Castle, Ky., and after a lapse of seven years he became a naturalized citizen of the United States, after which he was granted a license to

practice medicine in this state by the state board of health. He had taken a course, probably by correspondence, in electrotherapy and kindred methods of treating diseases in the American University of Chicago. He leased a building in New Castle, equipped it as a hospital, or sanatorium, and for a period of more than 25 years practiced his profession extensively in that community. Among his patients at the sanatorium was Leonard Barton who suffered from an affection of the heart and other serious ailments for a number of years. In addition to the relation of physician and patient a close personal friendship developed between Dr. Sesmer and Barton. Barton was a frequent visitor in the sanatorium and one of the rooms in the building was known as the Leonard Barton room. He would sometimes go to the sanatorium for a single treatment, but would frequently remain for several days.

A large amount of evidence was introduced, most of it bearing on the question as to whether or not the signatures, "L. Barton," on the note of December 8, 1920, and the alleged agreement of January 18, 1921, and a writing dated January 3, 1929, were the genuine signatures of Leonard Barton. The writing dated January 3, 1929, was produced at the trial by appellee, and reads as follows:

"New Castle, Ky., January 3, 1929.

"This is to certify that Dr. S. P. Sesmer treated me periodically every year since 1917, which is about 12 years, and during the whole time I did not pay him a single cent for his services. Therefore, I hereby state it is due him from me and in case of my death he shall be well paid for the whole 12 years of his faithful service rendered to me from my own estate.

"[Sgd] L. Barton."

It is conceded that the body of each of these writings is in the handwriting of Dr. Sesmer. Dr. Sesmer explains the writing of January 3, 1929, by saying that Leonard Barton, who died a few days later, was then in his hospital seriously ill, and that a few days before this writing was executed he had made a search for the note and the contract of January 18, 1921, and had been unable to find them. Believing that they were lost, and being of the opinion that he should have some

evidence that he had not been paid for the services he had rendered, he talked with Barton about it, and Barton dictated the paper in question, and signed it. All of this was developed on cross-examination.

Mrs. Sue Black, who was a nurse in the sanatorium, testified that several weeks after the death of Mr. Barton she found the note of December 8, 1920, and the contract of January 18, 1921, among Dr. Sesmer's papers. A number of witnesses testified that while they were patients in the sanatorium Leonard Barton, who was also a patient there, told them he had a contract with Dr. Sesmer by the year, and that he was to pay him $6 a treatment.

A number of witnesses, some of them employees and officers of banks where Leonard Barton had transacted business, were introduced as handwriting experts, and they testified that the signature, "L. Barton," on each of the written instruments in question was the genuine signature of Leonard Barton. Mrs. E. F. Napierala, who signed as witness the writing dated January 18, 1921, testified that Leonard Barton signed it in her presence.

Appellee introduced a number of witnesses who testified that in their opinion these were not the genuine signatures of Leonard Barton. A number of checks, letters, and other writings with Leonard Barton's admittedly genuine signatures were introduced in evidence and are in the record. H. C. Dale, cashier of the Deposit Bank of Eminence, Elmer Black, assistant cashier of the same bank, Morrison Stivers, cashier of the Central Bank of Pleasureville, and William Whitfield, cashier of the bank of Franklinton, were among the witnesses who testified that the signature, "L. Barton," on the note of December 8, 1920, and the two writings introduced in evidence, were not the genuine signatures of Leonard Barton. They qualified as handwriting experts, and in addition were acquainted with Barton's signature, as he had been a customer of the banks with which they were connected. A number of other witnesses who knew Barton's handwriting testified that the signatures on the disputed writings were not in his handwriting.

The only issue raised in the ordinary action on the note was whether or not Barton had executed the note.

In addition to the testimony of the witnesses that the signature, "L. Barton," was not in Barton's handwriting, there were a number of facts testified to by various witnesses from which the jury might infer that the note had not been executed by him. At the time the note was executed, and during all the time thereafter until his death, Barton carried large balances in several banks. It was shown that he invariably signed his name "Leonard Barton." The only instrument bearing the signature, "L. Barton," admittedly his, was a post card addressed to Dr. Sesmer, and this signature appeared at the bottom and in one corner of the post card where there was insufficient space to write his name in full.

While the evidence as to the genuineness of the signature on the note probably preponderates in favor of appellant, there was substantial evidence that it was not Barton's signature. There being a decided conflict in the evidence, the question was one for the jury to determine.

The facts in the instant case are somewhat similar to the facts in Security Benefit Association v. Payne, 222 Ky. 332, 300 S. W. 861, 863. The issue in that case was whether or not the appellee had signed certain papers. She denied that she had signed them, but four bankers introduced by the appellant as expert witnesses testified that in their judgment the signatures which appellee denied were written by the same person as were the signatures which she admitted were hers. There was also direct testimony that she had signed the papers in dispute. The jury by its verdict found that she had not signed the papers, and, in affirming the judgment, we said:

"Taking the evidence as a whole it preponderates in favor of the appellant; but this court cannot substitute its judgment about such disputed questions of facts for the judgment of a properly qualified and instructed jury. If this court should set aside the verdict of juries because it disagreed with their findings when there is substantial evidence on both sides of controverted fact it would be invading the province of juries and would tend to destroy the right of trial by jury. Where there is substantial evidence on both sides of a question of fact a jury may believe the evidence of one witness

as against the evidence of several others. A jury sees the witnesses and hears them testify, observes their demeanor on the witness stand and considers many things in the conduct of a witness which this court has no opportunity to consider. The jury searches out the truth, and there are many elements which they may consider in that process which this court cannot consider. Truth is like a gem that comes from the hand of a lapidary, it reflects the light with every turning and no one is so well qualified to observe the reflections as the jury. We cannot say, therefore, that the verdict of the jury should be set aside on the ground that it is against the weight of the evidence.''

So, in the instant case, we think the evidence was sufficient to sustain the verdict of the jury in the action on the note.

Appellant, in support of his motion for a new trial, filed his own affidavit in which he set out the names of newly discovered witnesses and the facts to which they would testify. The affidavits of these witnesses also were filed. Most of the alleged newly discovered evidence was merely cumulative, and not of such decisive character as would probably control the verdict of the jury, and was therefore not sufficient to warrant the granting of a new trial. Allender Company v. Browning's Administrator, 242 Ky. 273, 46 S. W. (2d) 116; Palmer Hotel Company v. Renfro, 173 Ky. 447, 191 S. W. 271.

The only newly discovered evidence which was material to the issue and not merely cumulative was the statement of E. H. Smith in his affidavit that Leonard Barton admitted to him that he had executed a note to Dr. Sesmer. E. H. Smith was cashier of the Bank of New Castle in which Barton was a depositor, and he was acquainted with Barton's signature. He was introduced as a witness by appellant, and was shown the note of December 8, 1920, and the other two disputed writings, and he testified positively that the signature, ''L. Barton,'' on each of the papers was in Barton's handwriting. In his affidavit filed after the trial, he stated that in 1922, or 1923, Dr. Sesmer applied to him as cashier of the Bank of New Castle for a loan of several hundred dollars and offered as col-

lateral a life insurance policy or a note executed by Leonard Barton; that he accepted the life insurance policy as collateral, and a few days later, while on a fishing trip with Barton, he told Barton he had refused his note as collateral on a note given by Dr. Sesmer to the bank, and Barton remarked, "It would have been all right to have accepted his note that he had given it to Dr. Sesmer." He also stated in his affidavit that he had not disclosed this fact to Dr. Sesmer or his attorney until after the trial. This evidence was material to the only issue in the action on the note, and was highly important, but the affiant had been used by the appellant as a witness, and he had been examined concerning the signature on the note in question. He was a friendly witness, and testified with the utmost frankness. Proper diligence in interviewing this witness undoubtedly would have elicited the information contained in his affidavit, and under these circumstances such facts are not a proper basis for granting a new trial on the ground of newly discovered evidence. Ely v. Commonwealth, 239 Ky. 638, 40 S. W. (2d) 276; Shepherd v. Commonwealth, 230 Ky. 611, 20 S. W. (2d) 466; Benge's Administrator v. Marcum, 194 Ky. 121, 238 S. W. 174; Home Insurance Company v. Cincinnati, N. O. & T. P. R. Co., 182 Ky. 778, 207 S. W. 487.

The sole issue presented in the ordinary action was whether Leonard Barton executed the note of December 8, 1920, and that issue was submitted to the jury in a proper instruction. Our conclusion on that branch of the case is that the verdict of the jury should not be disturbed.

In the action which was brought in equity and which the court refused to transfer to the ordinary docket, three questions were submitted to the jury. These questions with the jury's answer to each were as follows: (1) "The jury will say from the evidence, Did the decedent, Leonard Barton, sign the paper filed with petition dated January 18, 1921? Answer, Yes or No." The jury's answer was "No." (2) "The jury will say from the evidence, How many treatments plaintiff gave the deceased from December 18, 1921, to December 28, 1928?" The jury's answer was "200." (3) "For how many, if any, of the treatments did Leonard Barton pay plaintiff during the period from January 18, 1921, to December 28, 1928?" The jury's answer

was "200." As heretofore stated, this case should have been transferred to the ordinary docket. Essentially it was a suit at law, and no equitable issue was presented by the pleadings. The only issues presented were: Did Dr. Sesmer render the services alleged in his petition, and had he received payment therefor? No complicated accounts were involved. These questions were submitted to the jury as issues out of chancery, and for present purposes we shall treat the verdict as the verdict of a properly instructed jury in an ordinary action. The verdict, in substance, was to the effect that Dr. Sesmer had been paid for all the services that had been rendered by him.

Dr. Sesmer's records show that he had given Barton 695 treatments subsequent to the execution of the alleged note, for none of which he had been paid. The correctness of these records was attacked. In an amended answer, counterclaim, and set-off, the appellee alleged that Dr. Sesmer was indebted to Leonard Barton's estate in the sum of $725 for money loaned to him by Barton, and two checks for $250 and one for $75, payable to and indorsed by Dr. Sesmer, and a note for $150, signed by him, were introduced in evidence. It was proved conclusively that all of this indebtedness had been paid and this claim was practically abandoned.

It also was shown that for many years prior to his death Leonard Barton was a frequent visitor at the sanatorium and received numerous treatments. The direct evidence that he paid for these treatments is slight. Two witnesses testified that on two occasions they saw Barton pay a small amount of money to Dr. Sesmer, presumably for a treatment he had taken. No cancelled checks given by Barton to Dr. Sesmer and shown to have been in payment of services rendered by the latter were produced. Barton frequently went to the sanatorium for a single treatment, but on a number of visits he remained for several days, and occasionally for two or three weeks. If he paid for all the treatments, it is unlikely that he invariably paid in cash. A number of witnesses testified that Barton had stated to them that he had not paid Dr. Sesmer for his services. There is some testimony that Dr. Sesmer's records show charges for treatments on dates when Barton was not in New Castle. There was sufficient conflict in the evidence as to the extent of the services and

24

the payments that had been made to authorize a submission of these questions to the jury, but there was no evidence to warrant a verdict that appellant had been paid in full. The verdict to that effect was flagrantly against the evidence.

The judgment in the ordinary action is affirmed, and the judgment in the action brought in equity is reversed, with directions to transfer the case to the ordinary side of the docket, and for further proceedings consistent herewith.

The whole court sitting, except Dietzman, C. J., who took no part in the consideration of the case.